## UNITED STATES DISTRICT COURT
## WESTERN DISTRICT OF KENTUCKY
## LOUISVILLE DIVISION

BARBARA WILSON,                                                   PLAINTIFF

V.                                                      NO. 3:19-cv-229-BJB

PINNACLE FOODS INC., ET AL.,                                      DEFENDANTS

\* \* \* \* \*

### OPINION & ORDER

Barbara Wilson went to Kroger and bought a frozen dinner manufactured by Pinnacle Foods: Hungry Man Selects Frozen Chicken & Waffles. A month later, in February 2017, she cooked and ate the meal. In March she saw her oncologist after suffering from serious diarrhea, which she had battled previously due to colon cancer and a related surgery. In April her symptoms grew worse and—crucially for this dispute—she learned that the FDA had found Listeria in the plant that produced her waffles. Pinnacle Foods, the manufacturer, voluntarily recalled them and several other foods made in the same plant. Her symptoms worsened in May, when she was again hospitalized and underwent surgery to repair a ruptured hernia.

Wilson sued Kroger, Pinnacle Foods, and several related defendants on warranty and products-liability claims. She believes that Listeria from the plant caused her illness. Neither she nor the product she ate tested positive for Listeria. But medical notes indicate that after the recall she discussed this potential exposure with her doctor, who allegedly attributed her symptoms to an infection. And an expert witness—Dr. Thomas Cumbo—performed a differential diagnosis that indicated to him that the bacteria gave her a case of Listeriosis.

All the Defendants moved to exclude Dr. Cumbo's testimony (DN 36) and for summary judgement (DN 37) based on a lack of evidence that Listeria in Wilson's Hungry Man waffles caused her injuries. Because of the unprofessional and unhelpful nature of the brief filed by Plaintiff's counsel in opposition, the Court will strike the response and treat the motion to exclude as unopposed. Even if the Court allowed a substitute to be filed, however, the Defendants are correct that Dr. Cumbo is not qualified to opine that Listeria caused Wilson's illness, failed to reliably rule in or rule out alternative causes, and rested on improper speculation. With or without expert testimony, moreover, Wilson lacks evidence negating alternative causes as required under Kentucky law and could not support a jury verdict that Listeria probably caused her illness. The Court therefore grants summary judgement for the Defendants on all claims.

1

# I.   Factual Record

On summary judgment courts view the record in the light most favorable to the non-moving party. But here most of the facts about what happened are undisputed. The main question is *why* Wilson got sick.

## A. Wilson's shopping, eating, and hospitalization

On January 12, 2017, Barbara Wilson went grocery shopping at Kroger. Wilson Deposition (DN 37-3) at 20:3–4. She bought a Hungry Man Selects Frozen Chicken & Waffles meal. MSJ Response (DN 39) at 12. Sometime in February 2017, Wilson cooked and ate the meal. Wilson Dep. at 13. Whether she precisely followed the cooking instructions is disputed but ultimately beside the point, as discussed below.

Around a month later, in March 2017, Wilson visited her oncologist and complained of diarrhea. Cumbo Dep. (DN 36-4) at 68. Wilson had suffered from chronic diarrhea and loose bowel movements since a colectomy she received in 2013 after a colon-cancer diagnosis. *Id*. After her oncologist prescribed Imodium, her symptoms improved for a while. *Id*. But on April 25 she visited the hospital seeking treatment for more intense diarrhea and abdominal pain (which improved after she vomited). April 2017 Hospitalization Summary (DN 41-1) at 32, 34.

The April hospital records indicate she received diagnoses of enteritis (intestinal inflammation), dehydration, and leukocytosis (elevated white-blood count). *Id*. at 41. Wilson does not remember a doctor telling her those diagnoses or their cause. Wilson Dep. at 29:18–21, 30:20–23. She received a "thorough workup" that included a normal stool culture, which "show[ed] no evidence of standard bacterial causes of gastroenteritis." Cumbo Report (DN 36-3) at 2. The hospital treated Wilson with two antibiotics and discharged her after several days. *Id*. The hospital records from April do not mention Listeria.

## B. Listeria notice and subsequent hospital visit

After her April discharge, Wilson received an automated call (on May 7) and a notice on a Kroger receipt (on May 11) that she may have purchased a product that may have been contaminated with Listeria. Wilson Dep. at 36:1–6, 23–25; Kroger Receipt (DN 39-5). Days before, on May 5, Pinnacle Foods had issued a voluntary recall that included the Hungry Man chicken-and-waffles meal. Recall Notice (DN 36-4) at 1–2. This followed an April FDA inspection that reported "presumptive positive" Listeria results in parts of Pinnacle's Jackson, Tennessee facility that manufactured the chicken-and-waffles meal. FDA Report (DN 39-6) at 5; *see also* Recall Notice at 1 ("[P]reliminary results from environmental samples received May 1, 2017 were presumptive for the presence of *Listeria monocytogenes*").

The parties vigorously dispute whether, where, and when the FDA actually found Listeria, as well as whether the strain of Listeria (if any) was one harmful to humans. *See generally* MSJ Reply (DN 41) at 8–13; MSJ Response at 8–10.

Wilson connected the Listeria recall to her symptoms, believing the apparent exposure explained how she had been feeling. Wilson Dep. at 36:17–22. According to her deposition, she told her gastroenterologist about the recall during a regularly scheduled May visit. *Id.* at 37:17–23. The doctor replied, as Wilson recalls, "That explains it. That's what you had." *Id.* at 38:5–6. But he did not order any additional tests or prescribe any medication. *Id.* at 38:17–23. Her medical records from this visit mention Listeria for the first time, stating: "recent history of listeria infection," "admitted a few weeks ago for what was listeria gastritis, apparently," and "was called by Kroger to say some of her food may have been contaminated with listeria." May 2017 Hospital Summary (DN 38-1) at 242, 265, 271, 323. The doctors did not test her for Listeria, Wilson Dep. at 38; Cumbo Dep. at 28, and the hospital eventually discharged her with a prescription for another antibiotic, Cumbo Report at 2.

On May 16, Wilson again saw her oncologist and complained about a dull ache that had developed into severe pain. Wilson Dep. at 52:1–10. The oncologist and Wilson did not discuss Listeria. Wilson Dep. 52:9–10. But he did note increased bowel sounds and concern about the size of her previously repaired hernia. May 2017 Hospital Summary at 265; May 2017 Hospital Summary at 265.

The hospital admitted Wilson that same day based on her complaints of increased abdominal pain. May 2017 Hospital Summary at 265. A CAT scan revealed a small-bowel obstruction and problems with the hernia. *Id.* Doctors then performed an emergency surgery to repair a ruptured hernia. MSJ Response at 10. The doctors did not tell Wilson what caused her ruptured hernia, Wilson Dep. at 52, but she believes it was from the violent retching she had experienced, MSJ Response at 10. None of the doctors treating Wilson for her hernia rupture identified a potential cause of her symptoms. Wilson Dep. at 38, 52.

## II.   This Lawsuit

Wilson filed this lawsuit in Jefferson County (Ky.) Circuit Court. Notice of Removal (DN 1) at 1. The Defendants timely removed the case under 28 U.S.C. § 1332 after the state court dismissed two nondiverse defendants from the case. *Id.* at 3. Wilson had already made clear that the amount in controversy was over $75,000. *Id.*

The doctors who treated Wilson did not test Wilson for Listeriosis specifically, and the tests they did order did not indicate the presence of the Listeria bacteria. Wilson Dep. at 31, 38, 52; Cumbo Dep. at 28. But during discovery, Wilson disclosed Dr. Thomas A. Cumbo as a non-treating expert witness to prove causation. DN 11.

Dr. Cumbo opined that a differential diagnosis confirms she had Listeria, which caused her illness, symptoms, and surgery in the spring of 2017.

A differential diagnosis considers relevant potential causes of the illness and then excludes several causes to discover the most likely source of the illness. *Hardyman v. Norfolk & W. Ry. Co.*, 243 F.3d 255, 260–61 (6th Cir. 2001). When used correctly, this method is a widely accepted diagnostic tool. *Id.*

But the Cumbo Report didn't use the tool correctly, according to the Defendants. So they moved to exclude Dr. Cumbo's testimony (DN 36), challenging his qualifications and the reliability of his methods under the Supreme Court's familiar interpretation of Federal Rule of Evidence 702 in *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 589 (1993). The Defendants also moved for summary judgment (DN 37), chiefly on the ground that—with or without Dr. Cumbo's opinion—Wilson lacked evidence sufficient to create a genuine factual dispute over whether Listeria caused her illness and symptoms.

### III. Plaintiff's *Daubert* Brief and the Court's Show-Cause Order

The response by Plaintiff's counsel to the motion to exclude was remarkable—and troubling. The brief absurdly argued that the Court should deny the motion because the Defendants called the expert Timothy rather than Thomas Cumbo. Wilson Response to Motion to Exclude (DN 38) at 1–2. Based on this innocuous mistake—one all too familiar to parents of multiple children—Wilson took the extreme step of characterizing the motion to exclude as one directed at an "expert who simply does not exist." *Id.* at 1. This argument is patently frivolous. The Response disingenuously cited two precedents in support, both of which address the unrelated issue of relation back for unknown defendants. *See* Response at 2; Reply at 3. And the brief went downhill from there. It offered no meaningful legal response or authority regarding the legitimate concerns raised about Dr. Cumbo's qualifications and his opinion's reliability. Instead, the filing insulted the Defendants and their lawyers while kicking sand in the Court's eyes:

- The misspelling is "no different than Lebron James clanging a wide open dunk off the back of the rim, embarrassing himself in front of thousands of fans. Sure. He'll get it right the next time no doubt. But he still got lazy … and missed … and the missed dunk still does not count for any points and nor should a motion to exclude a named expert who simply does not exist."

- "If out of approximately 400 million Americans the Defendants want one of them specifically excluded as an expert witness in a case, then that single American must be properly identified…. The American justice system cannot be reliably premised on 'Well, you know what we meant.' That would be an absurd proposition."

- "There are far too many instances of a lawyer trying to play doctor."
- "Defendants also whine that Dr. Cumbo '… does not cite literature, studies, testing or a single piece of authority for his conclusions.'[1] That is an absurd statement."
- "They essentially argue that Dr. Cumbo cannot be an expert until he is an expert. Such absurdities will not fly. The 'fake it unto you make it' tone of their arguments is tiresome."
- "They went all in on that analogy… and the dice come up 7. Craps. Loser."
- "Thank God the Defendants are not running the world healthcare system because they would only prescribe drugs to dead bodies after confirmatory autopsies."

Response to Motion to Exclude at 1, 2, 4, 6, 7, 8, 10, 11.

To paraphrase the response brief, the "tone of the[se] arguments is tiresome" indeed. Bizarrely, counsel saw fit to accuse the *Defendants* of violating Rule 11 by moving to exclude the expert. *Id.* at 6. What should've been obvious was that Plaintiff's filing was the one potentially sanctionable. In a show-cause order that followed (DN 47), the Court explained that

> The sort of overheated presentation offered by counsel is unhelpful, to say the least, to the Court's efforts "to secure the just, speedy, and inexpensive determination of [this] action." FED. R. CIV. P. 1. Portions implicate this Court's inherent authority (and indeed responsibility) "to impose … respect, and decorum" in its proceedings. *Chambers v. NASCO, Inc.*, 501 U.S. 32, 43 (1991). An impertinent response of this type may needlessly cause delay and increased costs in this litigation by, for example, requiring the Court to hold a *Daubert* hearing in order to resolve legitimate questions raised by the motion to exclude but left unanswered by the Plaintiff.

Instead of holding such a hearing, however, the Court gave Wilson's lawyers a chance to respond and refile the brief. They agreed that a *Daubert* hearing was unnecessary, DN 48 at 2, but promptly filed a response and a motion asking to withdraw the initial *Daubert* opposition and file a substitute, apologetically claiming that the pandemic and related time and resource constraints contributed to the unhelpful brief, DNs 48–50. Analogizing to the strain of Gettysburg on President Lincoln, but confessing to less forbearance, counsel described this as a late-night draft

---

[1] This statement by the Defendants was not absurd; it was true. The report did not cite any external authorities, scholarly or otherwise. *See* below at § IV.A.

that should've never been filed.  DN 48 at 1 ("more a collection of sleep-deprived, vexatious ramblings than cogent legal argument").   The Defendants resist substitution: plaintiff's counsel has consistently caused problems, they say, and the pandemic has affected everyone.  DN 51.

The Defendants are correct.   Nothing about the Covid pandemic or this litigation justified the unprofessionalism and unhelpfulness of this *Daubert* response. The brief delayed the progress of this case, consumed the time and energy of court personnel attempting to resolve the motion to exclude, and added to the costs and burdens of all lawyers and parties involved in this case.  Tolerating filings that do not even purport to address the law or facts—but instead only deflect or call names— disserves the Court's, and the profession's, overarching interests in collegiality and efficiency, and the parties' specific interests in achieving a just and lawful resolution to this dispute.   Such an "unnecessary delay or needless increase in the cost of litigation" may supply good cause for sanctions.  *United Parcel Serv. Co. v. DNJ Logistic Group*, No. 3:16-cv-609, 2019 WL 4478845, at *5 (W.D. Ky. Sept. 18, 2019). And striking a brief, as this Court's show-cause order contemplated, is a fitting sanction when the brief affirmatively hinders the progress of litigation.  *See, e.g.*, *Williams v. Warden for Nevada, Women's Corr. Facility*, 489 F. Supp. 2d 1171, 1179– 80 (D. Nev. 2007) (striking a response for unprofessional attacks); *Reo v. Lindstedt*, No. 1:19-cv-2786, 2020 WL 728153, at *1–2 (N.D. Ohio Feb. 13, 2020) (striking a complaint on similar grounds).

Striking the *Daubert* opposition brief is an exercise of discretion that this Court does not take lightly.  But this measured response is far more appropriate than just looking the other way.  *See Seay v. Tenn. Valley Auth.*, 339 F.3d 454, 480 (6th Cir. 2003) ("[D]ecisions [whether to strike that] are reasonable, that is, not arbitrary, will not be overturned."); *Baker v. St. Paul Travelers Ins. Co.*, 670 F.3d 119, 123 (1st Cir. 2012) ("[t]rial judges have considerable discretion in the selection and imposition of sanctions" (quotation omitted)).   The unnecessary and unhelpful nature of the response here distracted and delayed these proceedings, prejudicing everybody.  More extreme sanctions might have been equally appropriate, but the Court declines to order outright dismissal or to tax fees and costs as Defendants request.  *See generally Carpenter v. City of Flint*, 723 F.3d 700, 709 (6th Cir. 2013) (courts should consider sanctions less "extreme" than outright dismissal).  Striking the response and denying the request to substitute a new response is a natural and proportionate consequence. Left unrebutted, Defendants' *Daubert* arguments are well-taken and amply justify excluding the opinion testimony offered through Dr. Cumbo.  *See Ordos City Hawtai Autobody Co., Ltd. v. Dimond Rigging Co., LLC*, 695 F. App'x 864, 871 at 871–74 (6th Cir. 2017) (affirming grant of partial summary-judgment motion that stood unrebutted after district court acted within its discretion by striking unhelpful response).

Even if the Court allowed Wilson to substitute its response brief (DN 50), however, the result would remain the same.  As explained below, Dr. Cumbo's

proffered opinions fall short of the mark traced by Rule 702 and the Sixth Circuit's precedents. Regardless of the procedural path, therefore, the Court reaches the same destination and grants the motion to exclude.

## IV.     Motion to Exclude Dr. Cumbo's Testimony

Federal Rule of Evidence 702 governs the admissibility of expert testimony. "A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise …" so long as the testimony satisfies four requirements:

(a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;

(b) the testimony is based on sufficient facts or data;

(c) the testimony is the product of reliable principles and methods; and

(d) the expert has reliably applied the principles and methods to the facts of the case.

The rule requires trial judges to ensure that expert testimony is relevant and reliable. *Daubert*, 509 U.S. at 589. That is a "flexible" inquiry, *id.* at 594, which affords trial judges "considerable leeway," *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 152 (1999).

The Sixth Circuit has interpreted the *Daubert* line of cases and Rule 702 as interposing a three-part requirement: 1) the witness must be qualified by knowledge, skill, experience, training, or education; 2) the testimony must be relevant, meaning that it will assist the trier of fact; and 3) the testimony must be reliable, as measured by the sufficiency of its factual basis and the reliability of its methods. *In re Scrap Metal Antitrust Litig.*, 527 F.3d 517, 528–29 (6th Cir. 2008). The proponent of the expert testimony bears the burden of establishing that the testimony meets those requirements by a preponderance of the evidence. *Pride v. BIC Corp.*, 218 F.3d 566, 578 (6th Cir. 2000).

The parties do not dispute the relevance of Dr. Cumbo's testimony—only his qualifications and his testimony's reliability.

### A. Qualifications

An expert can be qualified based on "knowledge, skill, experience, training, or education." FED. R. EVID. 702. But trial courts exercising their gatekeeper function may not blindly accept an assertion that an expert is qualified to testify. Opinion testimony connected to the facts of the case "only by the *ipse dixit* of the expert" does not suffice. *Nelson v. Tenn. Gas Pipeline Co.*, 243 F.3d 244, 254 (6th Cir. 2001) (quoting *Gen. Elec. Co. v. Joiner*, 522 U.S. 136, 146 (1997)).

Experts who rely primarily on their experience must "explain how that experience leads to the conclusion reached ... and how that experience is reliably applied to the facts." *Thomas v. City of Chattanooga*, 398 F.3d 426, 432 (6th Cir. 2005) (quoting FED. R. EVID. 702 advisory committee's note). Though courts are not in the business of parsing scientific resumes, they should always take care to compare general qualifications to specific opinions offered: "The issue with regard to expert testimony is not the qualifications of a witness in the abstract, but whether those qualifications provide a foundation for a witness to answer [the] specific question." *Berry v. City of Detroit*, 25 F.3d 1342, 1351 (6th Cir. 1994).

Several times in his deposition, Dr. Cumbo cited his medical experience as the basis of his opinion. Cumbo Dep. (DN 36-2) at 46:21, 25. He often referred to his "general understanding of infectious disease," "common knowledge in infectious disease," or other qualifications not directly related to the specific task at hand: determining whether Listeria from a frozen meal caused Wilson's illness. *Id.* at 21:5–6, 22:23, 24:1–2, 60:13–14. Wilson argued that Dr. Cumbo's opinions are "based on years of experience and basic notions of infectious disease medicine." Response at 7.

This general experience is beside the point, according to the Defendants, because the testimony Dr. Cumbo offers lies outside his specific experiences, which have little to do with Listeria. Motion to Exclude at 4. Dr. Cumbo relies primarily on his general experience as a treating physician, but fails to connect that experience to his opinion that Listeria in a Hungry Man dinner caused Wilson's sickness. Instead, he makes broad statements about experience with infectious diseases generally, Cumbo Dep. at 7:25–8:1, and (only somewhat more specifically) how he had "ru[n] into some cases of Listeria," though he could not recall them, *id.* at 8:1–2, 11–14. More to the point, Dr. Cumbo never connects his general experience treating Listeria and enteritis with any experience deducing *their causes*. Causation, not clinical diagnosis and treatment, is the question at issue. And "[t]he ability to diagnose medical conditions is not remotely the same," the Sixth Circuit has recognized, "as the ability to deduce ... in a scientifically reliable manner, the causes of those medical conditions." *Tamraz v. Lincoln Elec. Co.*, 620 F.3d 665, 673 (6th Cir. 2010).

The Sixth Circuit drew a similar distinction when it affirmed the exclusion of an oral surgeon in *Thomas v. Novartis Pharmaceuticals Corp.*, 443 F. App'x 58, 62 (6th Cir. 2011). There the plaintiff failed to connect the surgeon's general expertise to his specific testimony in that case. Although the surgeon had practiced for many years, treated the disease in question, attended conferences regarding it, and read relevant literature, the plaintiff failed to connect the expert's experience in *diagnosing and treating* the disease ex post to the distinct question of what *caused* the disease ex ante. *Id.* Dr. Cumbo certainly possesses less experience with the disease at issue than did the surgeon excluded in *Thomas v. Novartis Pharmaceuticals*—and no more insight into its potential causes.

8

Even if the Court were to consider the response Wilson sought to substitute, that brief merely argues that Dr. Cumbo is qualified to opine on the causes of Listeria because he has experience with infectious diseases.  Refiled Response (DN 50) at 4–9.  Listeria is an infectious disease, the argument goes, so can't Cumbo opine on its causes?

No.  That syllogism doesn't work, thanks to a number of fallacies in Wilson's reasoning.  Dr. Cumbo has experience with *some* infectious diseases, not all of them.  He has *some* experience with Listeria, but cannot really remember those cases.  And in any event, he doesn't purport to bring any specific experience with Listeria to bear on the diagnostic question at issue in this case.  Even crediting Dr. Cumbo's asserted experience *treating* Listeria on a few occasions, that does not, without more, qualify him to testify about the possible and probable *causes* of this particular disease.  Dr. Cumbo's qualifications in the abstract, in other words, do not "provide a foundation for a witness to answer [the] specific question" at issue here.  *Berry*, 25 F.3d at 1351.

None of Wilson's other arguments help, either.  She points to the large and stable amount of research available on Listeria and infers that Dr. Cumbo would be well versed in its causes.  And she is right that experts do not necessarily need to "always cite published studies on general causation in order to reliably conclude that a particular object caused a particular illness."  Refiled Response at 4–9 (quoting *Best v. Lowe's Home*, 563 F.3d 171, 180–81 (6th Cir. 2009)).  But Dr. Cumbo "did not conduct *any* research, undertake an independent study, or review a single piece of literature in rendering his report."  Motion to Exclude at 2 (emphasis added).  Nor did he cite any personal experience indicating why he believed that Wilson's springtime symptoms followed from her wintertime purchase and ingestion of this frozen meal.  He offers only his own say-so, without any corroboration or methodology that a court of jury could use to assess that opinion.  *See* Motion to Exclude at 4 (quoting Cumbo Report).  The mere fact that he is an infectious-disease doctor is not enough.  *See Thomas v. Novartis Pharmaceuticals Corp.*, 443 F. App'x at 62; *Tamraz*, 620 F.3d at 673, 670 (experience with motion disorders did not qualify a doctor as an expert on the causes of Parkinson's Disease).[2]

Dr. Cumbo may well possess great knowledge about Listeria.  But neither his report, nor his deposition, nor Plaintiff's responses make any such claim or offer any reason to think he does.  So the limited information given does not allow the Court to

---

[2] Wilson also cites a decision from this district that concluded an expert's relative lack of experience treating a particular disease went to the weight of the testimony, not its reliability.  *Forbess v. Lee's Famous Recipe, Inc.*, 2009 WL 4782390, at *4 (W.D. Ky. Dec. 9, 2009).  The doctor in that case, however, was an expert in diseases more specific to the one at issue; unlike here, the plaintiff didn't hold him out as an expert in "infectious disease" more broadly.  *Id.* at *3–4.  And unlike Dr. Cumbo, that doctor "performed independent research regarding th[e] bacteria" specifically at issue in that case, tying its causes in the United States to the very food the plaintiff had eaten.  *Id.*

make the required determination that he is qualified to offer these specific opinions to a jury.

## B. Reliability

The Defendants also question the reliability of Dr. Cumbo's differential diagnosis purporting to isolate Listeria as the probable cause of Wilson's illness. A reliable differential diagnosis, according to the law of the Sixth Circuit, "determine[es] the possible causes for the patient's symptoms and then eliminat[es] each of these potential causes until reaching one that cannot be ruled out or determining which of those that cannot be excluded is the most likely." *Hardyman*, 243 F.3d at 260–61 (quotation omitted). This analysis should rest on "physical examinations, taking of medical histories, and employment of reliable laboratory tests." *Best*, 563 F.3d at 179 (quotation omitted). If these tools are not used, "their absence makes it much less likely that a differential diagnosis is reliable." *Id* (quotation omitted)

A differential diagnosis was essential here because Wilson's treating physicians apparently did not test her for nor diagnose her with Listeriosis. Cumbo Dep. at 24; Wilson Dep. at 38, 52; Response to Motion to Exclude at 10. More than two years after different doctors failed to treat or test her for Listeriosis specifically, Dr. Cumbo relied on Wilson's medical records and deposition testimony to reason back to the conclusion that Listeriosis caused her symptoms. Cumbo Report at 2. Dr. Cumbo reached that conclusion based on several assertions that are—at a minimum—questionable based on the information available to him: (1) "Wilson consumed a product known to be contaminated with Listeria;" (2) her symptoms fell within the incubation period for Listeria; (3) the fact that her stool tested negative for Listeria is not dispositive because tests often return a false negative for Listeria and; and (4) her positive responses to prescribed medications were consistent with the responses he would expect in a case of Listeriosis. *Id*. at 3.

The Sixth Circuit has held that a "medical-causation opinion in the form of a doctor's differential diagnosis is reliable and admissible where the doctor":

(1) Objectively ascertains, to the extent possible, the nature of the patient's injury

(2) *Rules in* one or more causes of the injury using a valid methodology, and

(3) Engages in standard diagnostic techniques by which doctors normally *rule out* alternative causes to reach a conclusion as to which cause is most likely.

*Best*, 563 F.3d at 179 (internal quotation marks and citations omitted; emphases added). If the diagnosis fails any of these prongs, the court "*must* exclude the ultimate conclusion reached." *Tamraz*, 620 F.3d at 674 (emphasis added).

The Defendants object to Dr. Cumbo's approach on the basis that he "rul[ed] in" too few potential causes (only common bacterial infections), and then failed to "rule out" those alternative causes ("I wouldn't say ruled out. I would say less likely.") to conclude that Listeria was the most likely cause of Wilson's illness. Motion to Exclude at 10–12; Cumbo Dep. at 28:15–17. They also argue that Dr. Cumbo's conclusion that Listeria was the likely cause was based on several speculative premises. *Id*. at 13–16.

### 1. Dr. Cumbo failed to rule in or rule out potential causes besides Listeria

A valid differential diagnosis must rule in and out the plausible potential causes in order to deduce the most probable cause. *Hardyman*, 243 F.3d at 260–61. First the expert identifies, or "rules in," the potential causes of the known symptoms. *Id*. Then the expert eliminates those causes until one cannot be "ruled out" and is therefore the most likely cause. *Id*.

Caselaw does not offer or insist on a set methodology for a valid differential diagnosis. As to "ruling in," courts often accept studies or tests as a permissible way to identify a set of potential causes. *See Best*, 563 F.3d at 180 (valid methodology ruled in a chemical cause based on study of its properties); *Johnson v. Memphis Light Gas & Water Div.*, 695 F. App'x 131, 139–40 (6th Cir. 2017) (valid methodology ruled in heat stroke as a cause of death based on location, autopsy, and toxicology). Courts have consistently held, however, that speculation or hypothesis cannot support a valid differential diagnosis. *See, e.g.*, *Pluck v. BP Oil Pipeline Co.*, 640 F.3d 671, 679 (6th Cir. 2011) (doctor improperly ruled in benzene as a cause of plaintiff's cancer because he assumed any level of exposure could cause sickness).

As to "ruling out" potential causes, a doctor should "engag[e] in standard diagnostic techniques by which doctors normally rule out alternative causes to reach a conclusion as to which cause is most likely." *Best*, 563 F.3d at 179 (internal quotation marks omitted). When considering alternatives, caselaw does not require doctors to rule out every possible cause for a differential diagnosis to be admissible, *id.*, but they still must do so "to the extent necessary to reach a conclusion as to which cause is most likely," *Johnson*, 695 F. App'x at 142 (internal quotation marks omitted). As with the "ruling in" step, courts accept tests, studies, and carefully explained reasoning as bases for ruling out potential causes. *See, e.g., id.* at 142–43 (affirming expert's decision to rule out alternative causes based on an autopsy, organ examination, and toxicology report); *Best*, 563 F.3d at 178, 181–82 (expert properly ruled out nine medications, as well as spontaneous or unknown reasons). "[I]f the doctor engages in very few standard diagnostic techniques by which doctors normally rule out alternative causes, the doctor must offer a good explanation as to why his or her conclusion remains reliable." *Best*, 563 F.3d at 179 (internal quotation marks omitted). Of course, not considering potential alternative causes *at all* raises even

11

more serious concerns. *See Pluck*, 640 F.3d at 680 (by ignoring extensive smoking, doctor failed to rule out potential cause of cancer).

Here, Dr. Cumbo's report failed to rule in (and therefore didn't consider) alternative causes that he acknowledged were relevant—including viruses, autoimmune conditions, blood clots, or other bacteria. And during his deposition, he attempted to rule out those causes, but did so without employing any valid methodology. When asked about ruling out alternative causes, Dr. Cumbo declined to speak in the terms familiar to the caselaw: "I wouldn't say ruled out. I would say less likely. You know, because we didn't have any positive results." Cumbo Dep. at 28:15–17. When asked whether there "could … have been other potential causes," Dr. Cumbo admitted that "sure," *id.* at 28:24–29:2, "it's possible," *id.* at 34:10–15. Then he described several potential causes that he never mentioned in his report: "[p]ossibly viral," "some autoimmune diseases," "a blood clot," and "a lot of organisms that don't grow in standard culture," to name a few. Cumbo Dep. at 29–30; Cumbo Report at 2–3. This failure to consider and exclude other potential causes before landing on Listeria is a serious error that justifies excluding Dr. Cumbo's opinion. *See, e.g.*, *McCarty v. Arch Wood Prot., Inc.*, No. 11-109, 2016 WL 2936435, at *18 (E.D. Ky. Feb. 26, 2016) (excluding expert's differential diagnosis in light of his acknowledgement that "it's not that I've ruled out a lot of [other causes]").

This leaves serious gaps in Dr. Cumbo's report. He later acknowledged that non-infectious diseases like autoimmune diseases or a blood clot *could've* caused Wilson's symptoms. Cumbo Dep. at 29:22–25. But Dr. Cumbo never ruled these in as potential causes worth assessing. And at his deposition he purported to rule them out by simply concluding that they "are usually pretty easy to figure out." *Id.* at 30:1–2. But his report did not actually figure them out, and no methodology or explanation is apparent in his testimony purporting to do so. Opining on tests or diagnoses that are merely hypothetical is of course speculative. This approach does not represent a proper methodology under Rule 702. *See, e.g.*, *Tamraz*, 620 F.3d at 671 (doctor purported to distinguish between two potential causes of manganese exposure based on "tests he might do, [but] not tests he had done").

The most Dr. Cumbo's report does is claim that "the absence of any other positive culture results or *Clostridium difficile* tests argues for an undiagnosed bacterial cause of the enteritis." Cumbo Report at 3.[3] At best, this could rule out a few bacteria that would be more likely than Listeria to show up in a culture. But when asked whether the stool culture might've generated false negatives for other possible bacterial causes, Dr. Cumbo said, "I'm sure there are. There are a lot of organisms that don't grow in standard culture. But as far as more common ones that cause inflammation, they're very good at selected media." Cumbo Dep. at 30:6–10 (explaining that the bacteria most likely to cause symptoms like Wilson's didn't appear in the culture done at the time). Indeed, Dr. Cumbo said "any" bacterial

---

[3] *Clostridium difficile* is another bacteria that can cause intestinal infections.

organism could cause a false negative because "the problem with stool cultures is you're trying to find a true needle in a haystack," "so it can be very hard to get a positive result." *Id*. at 32:11–25. Even his own methodology leaves the door open to numerous potential bacterial causes, not to mention non-bacterial causes he didn't rule in for consideration in the first place.

Dr. Cumbo did acknowledge that several viruses could easily be the culprit. *Id*. at 29:16–21, 30:13–31:7; 32:11–15. He admitted that someone could have tested Wilson for these viruses, but did not know whether anyone did; therefore his report did not rule in (or out) these potential causes. *Id*. at 28:11–22. And his only basis for ruling out viral causes was his own deposition testimony that viruses are "usually self-limited and do[n]'t always involve the whole intestine." *Id*. at 29:19–21. Neither this nor any other methodology or foundation appeared in the report itself.

And Dr. Cumbo's report never ruled in (or even discussed) the most obvious potential alternative cause—Wilson's history with diarrhea because of her colectomy. *Id*. at 68:4–10 (explaining this medical history). In his deposition, Dr. Cumbo addressed this cause, though not in a compelling way: "You know, just because she has chronic diarrhea doesn't mean that she can't get sick with something." *Id*. at 69:12–14. That's true enough, as far as it goes—which is not very far at all. The prospect of *other* potential causes besides the prior illness is no basis for excluding the prior illness from the differential diagnosis. Indeed, his approach to alternative causes runs directly counter to the entire theory of a differential diagnosis. Like the doctor in *Pluck* who was excluded for ignoring the plaintiff's smoking habit, Dr. Cumbo brushed off Wilson's gastrointestinal problems from her battle with colon cancer and the resulting colectomy, even though that potential cause appears particularly relevant to her symptoms. *See Pluck*, 640 F.3d at 680. No reasoned methodology supported his decision. Saying she could've gotten sick from other causes is no reason to not even consider an additional cause.

### 2. Dr. Cumbo's conclusion that Listeria likely caused Wilson's symptoms rested on speculation and failed to consider credible reasons why Listeria might have been ruled out

Dr. Cumbo's diagnosis is unreliable for another reason: it relies on speculation and ignores confounding facts regarding critical aspects of the differential diagnosis. Conclusions based on speculation are unreliable. The Sixth Circuit held in *Pluck*, for example, that a doctor improperly ruled in benzene as a potential cause of plaintiff's cancer because he simply assumed benzene exposure of any level was enough to make them sick. 640 F.3d at 679. And in *Tamraz v. Lincoln Electric*, the Sixth Circuit held that a differential diagnosis was unreliable because it ruled in and settled on a chemical as the cause of plaintiff's Parkinson's disease—based only on speculation that the chemical could even cause the disease. 620 F.3d at 674. Relying on incomplete records or omitting important factors also can render unreliable a causation opinion reached using a differential diagnosis. *See, e.g.*, *In re Trasylol Prod*.

*Liab. Litig.-MDL-1928*, 2013 WL 1192300, at \*14 (S.D. Fla. Mar. 22, 2013) (unreliable diagnosis relied on incomplete records and ignored a prior related chronic illness).

As in *Tamraz*, Dr. Cumbo's opinion that Listeria was a likely cause rests on several incomplete and speculative premises. As explained in the Defendants' motion to exclude (at 4), the first three of the five steps in the report's "rationale" simply accepted as true disputed and unsupported propositions:

1) "She consumed a product *known* to be contaminated with *Listeria*."

2) "She developed … severe enteritis within an appropriate time frame for the known incubation period of *Listeria*."

3) "…*Listeria* could easily be the culprit, especially since we know she was exposed."

Cumbo Report at 3 (emphasis added).

His two remaining steps merely cite her responsiveness to antibiotics as evidence that she had a bacterial infection. The report does not assert that either drug was *specific* to Listeria, and therefore do nothing to exclude other bacterial causes. This assumes a major part of his conclusion: rather than asking whether a potential Listeria exposure could've made her sick, he in effect assumed that because she got sick she had in fact been exposed to Listeria. Dr. Cumbo relied on the recall notice (though he hadn't read it) and references to Listeria in her medical notes to *rule in* Listeria as a potential cause. *Id*. at 2. He couldn't stop there without considering not only the other potential causes discussed above, but also at least three arguments for *ruling out* Listeria.

**a. *Contamination.*** Dr. Cumbo assumed Wilson's food was contaminated with Listeria. *Id*. at 3; Cumbo Dep. at 16–17, 26–27. But he admitted that he did not review the recall, did not know it was voluntary, did not rely on the FDA report, and could not know that the "particular piece of food that she ate" was contaminated. Cumbo Dep. at 17–19. Instead, Dr. Cumbo's understanding of the recall and exposure came from Wilson's medical records, deposition, and counsel. *Id*. at 18. Wilson and her lawyers obviously lack the expertise to establish her exposure, and the medical records add little if anything since they rest on Wilson's own reports to her doctors. Those treating physicians were not familiar with any Listeria findings or recall at the plant, and never tested the product or Wilson for Listeria. *Id*. at 24, 34; Harrison Report (DN 36-7) at 5; Wilson Opp. Br. at 10. So Dr. Cumbo's exposure conclusion rests solely on hearing second-hand that "[s]he ate food from a plant that was known to be contaminated with [Listeria]." Cumbo Dep. at 33. When pressed on this point, he tried to "just throw it back to [Defendants]" by asking "how do [they] know she wasn't?" *Id*. at 33. This glib remark does nothing to bolster his analysis and makes a mockery of a differential diagnosis intended to answer this very question. After all,

14

Dr. Cumbo's job as an expert is to reliably assess whether Listeria was the *likely* cause of Wilson's illness—not just a metaphysical possibility.

    **b.  *Food Prep.***  If the chicken and waffles Wilson consumed reached internal temperatures of 165°F or higher, then Dr. Cumbo and Pinnacle's expert agree that any Listeria bacteria could not survive and infect a human.  *Id.* at 81–83; Harrison Report at 5.  Wilson testified that she followed the cooking instructions, Wilson Dep. at 13, though the parties nevertheless contest the nature and effect of the cooking. Regardless, Dr. Cumbo didn't account for any cooking or heat at all: he appears to somehow have been unaware that the frozen meal was or had to be cooked.  His report did not mention this in its rationale for deciding Listeria caused her symptoms. Cumbo Dep. at 79–80.  And when asked during his deposition whether Listeria would die off if the food reached the temperature called for in the instructions, Dr. Cumbo said only: "it's possible."  *Id.* at 78:12–18.[4]

    Dr. Cumbo did admit that an internal temperature of "165 degrees … should kill most things.  That will kill E. Coli.  That's the recommended temperature."  *Id.* at 83.  But he then posited that Listeria might have survived if the food was "te[e]ming" with Listeria."  *Id.* at 81–83.  He cited no evidence that the frozen food or its factory were teeming with bacteria.  *Id.* ("I don't know.").  Using supposition to avoid a confounding fact is no basis for a medical causation opinion.  And to his credit, Dr. Cumbo admitted he was "just speculating right now, to be perfectly fair."  *Id.* at 80.  That is true, and dispositive.  That Dr. Cumbo did not account for the effect of cooking on Listeria undermines the reliability of his report.

    **c.  *Incubation.***  Dr. Cumbo's report (at 3) said Wilson developed symptoms "within an appropriate time frame for the known incubation period of Listeria."  But he never defined the "appropriate time frame" or pointed to any scholarly or practical support for his conclusion that ingesting Listeria in February could've caused Wilson's symptoms in March and April.  In his deposition, he said the incubation period "depends on the host factor.  It can be [a] few days.  It can be several weeks." *Id.* at 22:18–20.  Dr. Cumbo acknowledged that "so many factors" affected the incubation length that he "can't tell you exactly what those are, but it depends on the health of the patient.  There's really no way to know."  *Id.* at 24.  He offered no support for this contested assertion other than his own "basic understanding of infectious

---

[4] The parties vigorously debate whether Wilson cooked the meal consistently with the instructions and whether cooking it for an improperly short amount of time would negate the effect of high temperatures on Listeria.  The important point at this stage, however, is simply that Dr. Cumbo's causation opinion is unreliable because he did not consider the obvious and important impact of cooking frozen food.  The refiled brief's argument that Wilson was confused during her first deposition and may not have followed the cooking time and temperature is no answer, because Dr. Cumbo ignored the issue entirely.  *See* Refiled Response at (DN 50) 17–21; Cooking Instructions (DN 50-4); Wilson Affidavit (DN 50-5); Heating Experiment (DN 36-6).

disease." *Id.* at 22–24. This supplies the Court (or a jury) with no methodology or reasoning whatsoever underlying Dr. Cumbo's conclusion that Listeria from February could've caused (and likely did cause) Wilson's symptoms in March and April.

* * *

The Sixth Circuit has identified several "[r]ed flags that caution against certifying an expert"—including "reliance on anecdotal evidence, improper extrapolation, failure to consider other possible causes, lack of testing, and subjectivity." *Newell Rubbermaid, Inc. v. Raymond Corp.*, 676 F.3d 521, 527 (6th Cir. 2012). Dr. Cumbo's opinion is susceptible to all these critiques. He relied on anecdotal evidence regarding the timing of Wilson's symptoms and the recall. He extrapolated from her medical records and treatment that she must've been exposed. He failed to consider her previous medical history, including chronic diarrhea. He discounted the negative result of the only test conducted. And he relied on his own subjective "general experience" with infectious disease to infer that Listeria exposure likely caused Wilson's symptoms. No valid methodology can be discerned from this process. His report explains why Listeria *could have* caused her illness, but says little about why Listeria rather than other potential causes likely *did* cause her illness— which is of course what a proper differential diagnosis must do. This backwards reasoning is the sort of expert testimony the Court of Appeals warned about in *Newell.*

Wilson's primary counterargument is that her medical records mention Listeria four times. Surely these references had some medical basis, says Wilson, at least enough to allow Dr. Cumbo to rely on them. Refiled Response at 10. Not so. The expert's job is to put together a puzzle of evidence, not just find his favorite piece. For at least two reasons, the appearance of the word Listeria in Wilson's medical records cannot sustain Dr. Cumbo's opinion.

*First*, assume those references actually did amount to a contemporaneous diagnosis of Listeria infection. Why, then, would we even need testimony from Dr. Cumbo? His opinion would do little but bolster the records it relied on. Yet Wilson did not even solicit the testimony of her treating doctors and instead relied solely on Dr. Cumbo's differential diagnosis.

*Second*, those medical records plainly do *not* reflect any sort of reliable medical diagnosis of Listeriosis. The first record that mentioned Listeria came from an appointment in May—four months after she bought the food and two months after the first of her post-Hungry Man doctor visits. May 2017 Hospital Summary at 242. Wilson told her doctor that Kroger contacted her about possible Listeria in her food. Wilson Dep. at 37–38. According to Wilson, the doctor said, "That explains it. That's what you had." *Id.* at 38. But the record does not indicate why that doctor jumped to this conclusion. Wilson, for her part, was concerned that the doctor did *not* proceed

16

to run any additional tests, prescribe anything, or diagnose her. *Id*. (Wilson said he did nothing because she was concerned about medical costs.) Wilson was concerned that she "wasn't diagnosed. That was my concern; that that hadn't been diagnosed." *Id*. Only after she told her doctors about the recall did the medical records refer to Listeria. *See* May 2017 Hospital Summary. And the medical records cited by Wilson merely summarize medical history; they do not make a diagnosis. *See, e.g., id*. at 323 (recounting that Wilson said Kroger called her because "some of her food may have been contaminated with listeria"). In fact, none of the doctors treating her hernia rupture even mentioned Listeria at the time. Wilson Dep. at 5:26–10. None of this provides a valid methodology or support that Dr. Cumbo could rely on to conclude that Wilson was likely exposed to Listeria, much less that any exposure caused her symptoms.

Again, this is not meant to conclude that Listeria is not, as a matter of fact, a possible cause of Wilson's symptoms. The concern is not that Dr. Cumbo ruled it in as a potential cause, but that he uncritically accepted factual propositions that should've caused him to consider ruling it out. Yet the record contains nothing rendering Dr. Cumbo's largely unsupported causation opinion appropriate for a jury to hear. To perform its gatekeeping role in evaluating Dr. Cumbo's methodology and potential testimony under *Daubert* and Rule 702, the Court may not allow unreliable opinion testimony based on speculation and incomplete evidence.

## V. Motion for Summary Judgement

The Defendants also moved for summary judgement, arguing that Wilson could not prove causation, especially without Dr. Cumbo's testimony. DN 37. Summary judgment is warranted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a). While the Court must view the evidence in the light most favorable to the non-movant, *Green v. Burton Rubber Processing, Inc.*, 30 F. App'x 466, 469 (6th Cir. 2002), the "mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient; there must be evidence on which the jury could reasonably find for the plaintiff," *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252 (1986).

### A. Causation and the need for expert testimony

Although the exact nature of Wilson's claims is hardly clear from her filings, she appears to seek damages based on breach-of-warranty and products-liability theories, DN 1-2 at 4–5, and doesn't dispute this characterization of her claims by the Defendants, *see* MSJ (DN 37-1) at 4. Regardless of the particular theory of liability, Wilson must prove that the Defendants caused her injury. "Under Kentucky law, a plaintiff has the burden of establishing causation in claims of strict liability, as well as in claims of negligence and breach of implied warranty." *Morales v. Am. Honda Motor Co.*, 151 F.3d 500, 507 (6th Cir. 1998). Causation is determined by the so-

called "substantial factor" test: whether the conduct was a substantial factor in bringing about the injury. *Id.*

Plaintiffs may prove a substantial factor by direct evidence or circumstantial evidence, so long as it "tilt[s] the balance from possibility to probability." *Calhoun v. Honda Motor Co.*, 738 F.2d 126, 130 (6th Cir. 1984) (quoting *Perkins v. Trailco Mfg. & Sales Co.*, 613 S.W.2d 855, 857 (Ky. 1981)). Probable means more likely than not. *In re Beverly Hills Fire Litig.*, 695 F.2d 207, 219 (6th Cir. 1982). And to rely on circumstantial evidence, the plaintiff must negate alternative causes of the injury. *Burgett v. Troy-Bilt LLC*, 970 F. Supp. 2d 676, 681 (E.D. Ky. 2013), aff'd, 579 F. App'x 372 (6th Cir. 2014); *see, e.g., Perkins*, 613 S.W.2d at 857–58 (negated other possible causes of trailer malfunction); *Midwestern V.W. Corp. v. Ringley*, 503 S.W.2d 745, 747 (Ky. 1973) (did not negate other possible causes of car accident besides brakes). So when an "injury may as reasonably be attributed to a cause that will excuse the defendant as to a cause that will subject it to liability, no recovery can be had." *Siegel v. Dynamic Cooking Sys.*, 501 F. App'x 397, 403 (6th Cir. 2012) (quotation omitted) (experts could not narrow the cause to a single defect, but sufficiently narrowed it to the product at issue, meaning no alternative causes could "excuse the defendant").

Under Kentucky law, "expert witnesses are generally necessary, indeed essential, in products liability cases, as they are in medical malpractice actions, to prove such matters as a product defect and proximate causation, unless of course the nature of the defect and resultant injuries are so obvious as to fall within the general knowledge of the ordinary person." *Thomas v. Manchester Tank & Equip. Corp.*, No. 3:03-cv-705, 2005 WL 3673118, at *1–2 (W.D. Ky. May 13, 2005) (quoting William S. Haynes, KENTUCKY JURISPRUDENCE: TORTS § 21-18 (1987)). For example, a ruling from the neighboring district court required expert testimony to prove that potentially defective flip flops caused a rash. *Freytes v. Wal-Mart Stores E., LP*, No. 10-cv-38, 2011 WL 2119383, at *3–4 (E.D. Ky. May 26, 2011); *see also Holbrook v. Rose*, 458 S.W.2d 155, 157–58 (Ky. 1970) (after physician retracted opinion, no evidence indicated that the drug in question caused the injury). An expert is not required, however, when a "jury can comprehend the facts and draw correct conclusions as well as a specially trained expert could." *Burgett*, 970 F. Supp. 2d at 681–82 (because the mower at issue was complex, an expert (not just fact-witness deposition testimony) was required to show causation).

Other states require similar showings from experts in cases about potentially contaminated food. In a very similar case, a trial judge within this Circuit excluded a physician for relying on assumptions, which prevented the plaintiff from proving causation in his contaminated-food case under Tennessee law. *Rolen v. Hansen Beverage Co.*, 193 F. App'x 468, 474 (6th Cir. 2006) (without an expert, the plaintiff could not prove that the juice he consumed caused his serious stomach issues). Other decisions are in accord. *See, e.g., Gross v. King David Bistro, Inc.*, 83 F. Supp. 2d 597, 602 (D. Md. 2000) (because expert lacked supporting evidence, nothing in the record indicated that the food caused the illness); *Tran v. Kemper Ins. Co.*, 55 F. App'x 343,

344–45 (6th Cir. 2003) (Plaintiffs "utterly failed to present any expert evidence that contaminated food had caused them injury, as required under Tennessee law.").

### B. Wilson lacks evidence to support a jury finding on causation

Without expert opinion testimony, Wilson cannot prove that Listeria from Defendants' product caused her injuries. Wilson's stool culture tested negative for Listeria. No one ever tested the product itself. No doctor diagnosed her with Listeriosis at the time. So we lack any direct evidence of causation. Cumbo Report at 3; Cumbo Dep. at 28, 31, 67; April 2017 Hospital Summary (DN 41-1); Wilson Dep. at 10, 29–31.

In order to find causation circumstantially, a jury would have to at least consider the presence and effects of a particular bacteria known as *Listeria mono*, its incubation time, and whether cooking the food affected its ability to infect Wilson.[5] These are complex medical problems outside the understanding of ordinary people. Expert testimony would aid a jury in this context just as much as it would in a medical-malpractice case. *See, e.g.*, *Thomas v. Manchester Tank & Equipment*, 2005 WL 3673118, at *1–2 (expert required in med-mal case). If an expert was necessary to show that flip flops caused a rash, then surely an expert would be required to show that Listeria caused Wilson's illness. *See Freytes*, 2011 WL 2119383 at *3–4.

To prevail at trial, moreover, Wilson would have to negate the various possible alternative causes for her illness that the Defendants could attempt to prove, including blood clots, viruses, other bacteria, and the cancer treatment that previously caused her chronic diarrhea. Cumbo Dep. at 28–32, 68. Discounting such other possible medical causes is definitely outside most lay juror's knowledge. Yet the testimony of Wilson's only expert is inadmissible precisely because he could not negate these alternative causes. *See* IV.B.1 above. No reasonable jury could conclude that Listeria is the probable cause when so many alternatives remain unrebutted. *Burgett*, 970 F. Supp. 2d at 681. Moreover, no evidence indicates that any specific product (much less Wilson's meal) tested positive for Listeria or that anyone else has gotten sick from eating the recalled Pinnacle products. So contamination is merely a

---

[5] As noted above at n.4, the parties spend a great deal of time arguing whether Wilson cooked the meal to an internal temperature of 165 degrees, which they agree would likely kill any Listeria. The Defendants point to evidence that cooking the meal for 35 minutes in an oven would bring the food to 200 degrees; Wilson points to an affidavit that she cooked the meal for only 20 to 25 minutes, which align with the actual instructions. Refiled Response at 17–21; Cooking Instructions; Wilson Affidavit; Heating Experiment. This undermines the evidence that cooking likely killed any Listeria—but it does not negate it, as the meal was cooked and still could have reached 165 degrees. *Id.* That point is unrebutted. The cooking at least makes Listeria less likely, even though it is not dispositive. So a jury would have to consider this without an expert from Wilson, which is hardly a task within the knowledge of a typical juror.

possible, not probable, cause.  MSJ at 3; Reply at 12 (FDA tested only parts of the facility, not specific products).

Wilson's only counter is that causation lies within the understanding of jurors. Wilson's medical records, she again emphasizes, mention Listeria four times, and we know the manufacturer issued a recall of a product she ate that came from a plant potentially infected with Listeria.  MSJ Response at 10–11.  Isn't this enough to support a logical jury finding that Listeria caused her illness?  For at least two reasons, it is not.

*First*, as noted above, the jury could not simply accept the medical notes as establishing Listeriosis.  Wilson herself mentioned the recall to her doctor, who failed to conduct further tests and whose examination itself did not diagnose her with Listeriosis.  Wilson Dep. at 37–38.  None of the references to Listeria in her records state that she has or had Listeriosis; they were all phrased in the past tense to refer to the recall and her prior potential exposure.  One notation explicitly referred to Wilson telling the doctor about the recall and her perceived exposure.  May 2017 Hospital Summary at 323.  Previously the notes did not mention Listeria.  *See* April 2017 Hospital Summary at 32 (diagnosing enteritis, but not mentioning Listeria); Wilson Dep. at 29–31.  And her treating doctors during this period also did not mention Listeria to her.  Wilson Dep. at 52.  That does not amount to a diagnosis of Listeriosis.

*Second*, we cannot artificially cabin the jury's consideration to the records-and-recall information Wilson says they have the common sense to consider on their own. Even if that approach could establish Listeriosis as a *possible* cause, it would not represent "sufficient proof to tilt the balance from possibility to probability … by eliminating other possible causes."  *Enlow v. St. Jude Med., Inc.*, 327 F. Supp. 2d 738, 741 (W.D. Ky. 2003) (quoting, inter alia, *Midwestern V.W. Corp. v. Ringley*, 503 S.W.2d 745 (Ky. 1973)).  Regardless of what the records and recall suggest on their own, they would tell a jury precious little about whether, for example, complications from cancer surgery represent a more likely cause than Listeria.

In *Enlow*, another similar case, a plaintiff's estate claimed that it did not need an expert to prove that a defective heart valve caused the plaintiff's death, because anyone could infer the cause from the death—a type of *res ipsa loquitor* argument. *Id.* at 740–71.  A decision from this district concluded that too many alternative causes remained for the claim to proceed without supporting testimony from an expert.  *Id.* at 743 (collecting similar medical-device cases).  So even if an expert were not required to rule in Listeriosis, so to speak, Wilson points to no evidence that could rule out the numerous possible alternative causes.  This would prevent a jury from reasonably concluding that Listeria is a probable rather than possible cause under Kentucky law.

And even if Dr. Cumbo's testimony were admitted, the flaws with his testimony would remain. He admitted that Wilson's illness could be caused by multiple sources, including viruses, other bacteria, blood clots, and more. *See* IV.B.1 above; Cumbo Dep. at 28–32. And he did not account for her history of chronic diarrhea caused by her colectomy, proclaiming that didn't mean "she can't get sick with something." Cumbo Dep. at 69. Dr. Cumbo did not negate any of these alternative causes, and neither does Wilson's remaining record evidence. Based on the failure of the Cumbo Report to address and rule out plausible alternative causes, Wilson could not reasonably show Listeria probably caused her illness even with the support of the limited opinion testimony he purported to offer.

Again, this case is nearly identical to another persuasive out-of-state decision. In *Picciano v. Costco*, a man got sick after he ate peaches. No. A-3071-17T2, 2019 WL 930279, at *1 (N.J. Super. Ct. App. Div. Feb. 25, 2019). Then he received a recall notice for peaches, but tested negative for Listeria. *Id.* He sued Costco and offered expert medical testimony that Listeria was a possible cause. *Id.* The court granted summary judgment to the defendants, however, because the product was only *possibly* contaminated (even given the recall), the plaintiff suffered from a pre-existing condition, and the expert did not rule out possible alternative causes. *Id.* at *4. Similarly, even assuming Dr. Cumbo's testimony were permissible, evidence indicating Wilson's food was contaminated (especially after cooking) is hardly conclusive, while evidence *does* show she suffered from pre-existing chronic diarrhea and that multiple alternative causes remain. So Wilson has not pointed to any evidence in the summary-judgment record that could prove that Listeria was not just a possible but also the probable cause of her illness.

Wilson's last-ditch response to all of this focuses on the importance of food safety, the centrality of federal regulation, and the dangers of Listeria. Wilson MSJ Opp. Br. at 1–7. This is undoubtedly true, but very much beside the point. To hold someone liable for a food-related injury as a matter of Kentucky tort law, a plaintiff must show the product caused her condition. Wilson fails to provide sufficient evidence that a reasonable jury could use to find that here.[6]

---

[6] Three additional reasons support summary judgment on some (but not all) of Wilson's claims.

*First*, Wilson's claim against Kroger for products liability, Wilson Dep. at 72, requires a showing that the retailer "breached an express warranty or knew or should have known at the time of distribution or sale of such product that the product was in a defective condition, unreasonably dangerous to the user or consumer." KRS § 411.340; *see also West v. KKI, LLC*, 300 S.W.3d 184, 192 (Ky. Ct. App. 2008) (citing *Franke v. Ford Motor Co.*, 398 F.Supp.2d 833, 841 (W.D. Ky. 2005)). Not only does Wilson fail to provide any evidence of an express warranty or knowledge, she does not even allege it.

*Second*, to maintain a breach-of-warranty claim against the Pinnacle defendants, Wilson must have been in privity with them. *See Snawder v. Cohen*, 749 F. Supp. 1473, 1481 (W.D.

# VI.    CONCLUSION

The Court strikes Wilson's response to the motion to exclude (DN 38), denies Wilson's motion to withdraw and refile her response (DN 49), grants the Defendants' motion to exclude Dr. Cumbo's expert testimony (DN 36), and grants the Defendants' motion for summary judgement (DN 37).

---

Ky. 1990) (citing *Williams v. Fulmer*, 695 S.W.2d 411, 413 (Ky. 1985)); *Taylor v. Southwire Tools & Equip.*, 130 F. Supp. 3d 1017, 1021 (E.D. Ky. 2015).  Again, Wilson has no evidence or allegations that she was in privity with the Pinnacle defendants.  *See Red Hed Oil, Inc. v. H.T. Hackney Co.*, 292 F. Supp. 3d 764, 778–79 (E.D. Ky. 2017) (warranty claim against e-cigarette manufacturer failed because plaintiff didn't allege privity).

*Third*, even if some additional information might've allowed these claims to proceed, Wilson has not provided any such facts or law.  In fact, Wilson does not respond at all to the two arguments just mentioned.  *See generally* MSJ Response (focusing on the dangers of Listeria and how a layman might infer causation).  "[I]ssues adverted to in a perfunctory manner, unaccompanied by some effort at developed argumentation," of course, "are deemed waived." *McPherson v. Kelsey*, 125 F.3d 989, 995–96 (6th Cir. 1997) (quotation omitted); *see also Scott v. Tennessee*, 878 F.2d 382, *2  (6th Cir. 1989) (failing to respond to or oppose a motion waives opposition).  Wilson clearly forfeited any arguments on the products-liability claim against Kroger and the warranty claims against the Pinnacle defendants.  Indeed, the lack of specific citations and the general hand-wa[i]ving nature of Wilson's response could forfeit any argument against summary judgment not tied to the need for and implications of expert testimony.